**UNITED STATES of America,**
**Plaintiff,**

v.

**STANDARD OIL COMPANY (NEW JERSEY) and Potash Company of America, Defendants.**

**Civ. A. No. 954–64.**

United States District Court
D. New Jersey.
March 31, 1966.
As Supplemental April 28, 1966.

Fred D. Turnage, Nicolaus Bruns, Jr.,
Richard T. Colman, Dept. of Justice,

Washington, D. C., for the United States.

Stryker, Tams & Dill, by William L. Dill, Arthur C. Dwyer, for Standard Oil Co. and Potash Co. of America.

Covington & Burling, by Hugh B. Cox, Gerhard A. Gesell, Henry P. Sailer, and Robert J. Muth, Washingon, D. C., of counsel for Standard Oil Co. and Potash Co. of America.

Thomas Monaghan, Grant W. Kelleher and David G. Gill, New York City, of counsel for Standard Oil Co.

Davis, Graham & Stubbs, by Donald S. Stubbs, and W. David Slawson, Denver, Colo., of counsel for Potash Co. of America.

SHAW, District Judge.

This is an action by the United States brought pursuant to the provisions of Section 15 of the Clayton Act (15 U.S. C.A. § 25) to restrain defendants Standard Oil Company (Jersey) and Potash Company of America (PCA) from consummating an agreement whereby Jersey would acquire all the stock and assets of PCA in alleged violation of Section 7 of the Clayton Act (15 U.S.C.A. § 18).

Jersey is a New Jersey corporation maintaining its principal place of business in New York. PCA is a Colorado corporation with its principal place of business in Denver, Colorado. Jersey organized a Delaware corporation known as Potash Company of America, Inc. (Delaware) to function as a wholly owned subsidiary of Jersey. On September 16, 1964 Jersey, PCA and Delaware became parties to an agreement captioned "AGREEMENT AND PLAN OF REORGANIZATION" whereby PCA would transfer all of its assets to Delaware in exchange for 850,000 shares of Jersey's par value capital stock. Upon consummation of the agreement PCA as an independent, separate corporate entity would pass out of existence and its successor, Delaware, would conduct the business in which PCA had been engaged. Consummation of the agreement was enjoined pending determination on the merits of the government's complaint alleging that the acquisition of PCA by Jersey in the form of a wholly owned subsidiary of Jersey would violate Section 7 of the Clayton Act.

The pertinent provisions of the Act are quoted as follows:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

Both of the defendants are corporations engaged in interstate and foreign commerce and are subject to the jurisdiction of this Court. Production and sale of potash is the relevant line of commerce and the United States as a whole is the relevant geographical area or market within which the effects of the acquisition of PCA by Jersey upon competition must be measured. The parties have so stipulated and the stipulation is supported by the evidence. An association composed of potash producers called the American Potash Institute computes statistics of the trade in potash as a separate and distinct industry. The Bureau of Mines, Department of the Interior of the United States Government publishes a yearly pamphlet of information on the potash industry. Producers of potash in the United States compete with each other for the business of customers in all parts of this country.

Approximately 95% of the potash produced is purchased by fertilizer companies for agricultural purposes. Potassium, a product of potash, is one of the three primary nutrients needed for optimum plant growth. The other nutrients are nitrogen and phosphate. Where soil in its natural state does not provide one or more of these nutrients in sufficient quantity, an application of some form of fertilizer is necessary to produce healthy crops. No one of these

primary plant nutrients can be substituted for the other, and at present potash cannot be synthesized. Where soil requires these three nutrients, fertilizer companies combine them in a mixed fertilizer.

The potassium content of potash is usually expressed by the trade either in terms of potassium oxide ($K_2O$) or muriate of potassium (KCl). The $K_2O$ content represents the potassium concentration. The commercial muriate of potash has a $K_2O$ equivalent of approximately 60%.

Potash produced in Canada is and will be competitive with potash produced in this country. Increasing amounts of potash produced in Canada are being sold in the United States in competition with potash mined in this country.

## JERSEY

As a corporate entity, Jersey functions primarily as an investment corporation. It invests the funds of its stockholders in subsidiary and affiliated corporations which are directly responsible for the operation of the various industrial enterprises which produce revenue for the parent company. Viewed in the light of its management, control and participation in the operating enterprises of its subsidiaries and affiliates which produce Jersey revenues, Jersey is, for all practical purposes, directly engaged in the business which each of them conduct.[1] It is the general policy of Jersey, subject to a few exceptions, to hold 50% or more of the capital stock of operating industrial corporations in which it invests its funds. The conduct of the business of these corporations is closely supervised by Jersey.[1a]

Jersey holds more than 50% of the capital stock of over 200 foreign and domestic corporations engaged primarily in exploration, production, refining, transportation and sale of petroleum and derivative products including petrochemicals. Its capital expenditures for research, exploration and capital investment are world-wide, extending into more than 100 countries. In addition to its broad scale participation in the petroleum and petrochemical industries, it has reached and is reaching into other areas of industrial enterprise. During 1964 it arranged for the purchase of the business of American Cryogenics, Inc., a company engaged primarily in the manufacture and sale of liquified industrial gases and associated equipment used to create extremely low temperatures. Jersey has engaged in the development of real estate in Texas for light industry, residential and commercial use; it has acquired interests in the manufacture of textiles and film from polypropylene and in the production and sale of fertilizer products in foreign

1. This finding is limited to the factual and legal issues presented in this case and is not intended as a guide line to serve as precedent in any other case with respect to any issue of jurisdiction, venue or taxation.

1a. Testimony of Monroe Jackson Rathbone, Chairman of the Board of Directors of Jersey:
"Q. Mr. Rathbone, what is the function of the board of directors of Jersey? What does it do?
A. Well, the primary or basic job of the board of directors of the Jersey company is to invest the funds, the money which comes to us from our stockholders, with the idea of making as good a return on the investment of that capital as we can make. A very important part of that also is to preserve and guard the integrity of the principles [sic], as well as to earn a current return on the invested capital.
In furtherance of that specific responsibility we have, we generally look at and appraise the performance of all the affiliated companies which Jersey has, or quite a large number of them to see whether we think that the performance or the management of those companies is sound and adequate. Where we find that we don't think it is quite as strong as it should be we make recommendations to them with respect to changes in the management, strengthening or bolstering up the management, as well as recommendations with respect to the way in which they administer their responsibilities.
Another important part of our job in the board of directors is to give coordination and advice, technical advice, commercial advice, all sorts of advice to the managements of these various affiliated companies in a very wide variety of fields."

countries; and also anticipates entry into the field of production of sponge iron.

In the administration of its investment policies, emphasis has been placed upon expansion of present corporate subsidiary and affiliate enterprises and continuing search for profitable diversification in new fields either by self-development or acquisition.[2]

In 1963 Jersey's gross revenues totaled $11,931,463,000; its assets aggregated $11,996,691,000; and its net profits after taxes were $1,019,469,000. It was reputed in 1963 to be the largest industrial corporation in the United States and in the world in terms of assets, and the second largest in the world in terms of net profits.

In 1963 Jersey's total capital of $11.9 billion was employed: $5.6 billion in the United States; $2.7 billion in other Western Hemisphere countries; and $3.5 billion in the Eastern Hemisphere. The company's 1963 net income of $1 billion was derived: $354 million from the United States; $310 million from other Western Hemisphere countries; and $355 million from the Eastern Hemisphere.

Liberal capital expenditures over the years in furtherance of the policy of expansion and diversification of corporate activities have resulted in a significant growth of Jersey in terms of capital assets and profits. Jersey's capital assets in 1948 approximated $3.4 billion and its net profit after taxes for that year was approximately $365 million (compare with previous statement of assets and earnings for 1963).

The coordinated functions of a Board of Directors, an Executive Committee and a Board Advisory Committee on investments (BAC) encompass the responsibility for top level decisions of Jersey in business management of existing enterprises and formulation of policy for future expansion and diversification.

The Board of Directors approves the investment of funds of the stockholders, examines management and policy of affiliates, and makes available to affiliate companies the advice and guidance of Jersey staff groups organized for purposes of research and expert analysis of profitable business management and launching of profitable new enterprises. The members of the Board of Directors are executive officers of Jersey who work full time and meet once a week as a board.

---

2. 1963 Annual Report of Jersey:

"Jersey is actively studying various business opportunities that would expand the scope of the company's operations. Last year the company announced financial, managerial, and engineering interests in a manufacturing complex in Greece which will include oil refining and chemical plants. Early in 1964 Jersey took a step into a new area by arranging for the purchase of the business of American Cryogenics, Inc., a company engaged primarily in the manufacture and sale of liquefied industrial· gases and associated equipment used to create extremely low temperatures. The importance of these materials goes far beyond ordinary refrigeration. New developments in cryogenics are making significant contributions to the steel, aircraft and missiles industries and to the field of medicine. It is expected that the use of such equipment will increase greatly during the next ten years.

"Humble Oil & Refining Company [a wholly owned subsidiary of Jersey] continued to increase its production of crude oil and natural gas liquids through the development of its extensive reserves and the negotiation of important new long-term natural gas contracts. Humble is carefully expanding its direct marketing operations in the United States, and late in 1963 the company entered into an agreement with Tidewater Oil Company to acquire for $329,000,000 important marketing facilities in six western states and Hawaii and a refinery in California. This acquisition will place Humble in a competitive position in the rapidly growing West Coast market, where today it has very little representation.

"Humble undertook a new phase in the land development of a large ranch it owns southeast of Houston, Texas, where it had previously been only an oil producer. Two years ago, in conjunction with Del E. Webb Corporation, Humble began the development of a residential, commercial, and light industry complex which now adjoins the National Aeronautics and Space Administration laboratory. The latest project, planned in association with the Houston Port Commission, will provide industrial sites with utility and harbor facilities for heavy industry, especially those that are NASA-oriented."

The Executive Committee of Jersey consists of the Chairman of the Board of Directors, the President of Jersey and six vice presidents. This committee meets daily and has the delegated authority to act on behalf of the Board of Directors between meetings of the board. This delegation of authority is subject to only "a few specially exempted functions, such as the declaration of dividends and a few things of that type.[3]" The Executive Committee also reviews the budgets of affiliates. The actions taken by the Executive Committee are reported to the Board of Directors during each weekly meeting and, in general, are approved by the board. The board does, however, reserve the power to reject recommendations of the Executive Committee and to make changes in actions taken by the Executive Committee.

BAC is a committee consisting of executive officers in the major staff groups of Jersey.[4] The function of the BAC is to appraise and analyze proposals made to the Executive Committee or the Board of Directors of Jersey by affiliated companies or by staff departments with respect to proposed investments. All proposed projects of a staff group or affiliate above a certain dollar volume (approximately $5 million) are presented both to BAC and the Executive Committee. BAC conducts the more detailed review of such proposed investment projects, makes recommendations to the Executive Committee and also reports directly to the Board of Directors. It maintains close association with the activities of the various departments and staff groups of Jersey.

Jersey has numerous staff groups which assist in the discovery, analysis and appraisal of expansion opportunities available to affiliates and in profitable investment diversification by Jersey in new fields of industrial enterprise. Some of these exist in corporate form for various tax and legal reasons and others are in the form of Jersey departments. Projects are also initiated by affiliates and, if a project is recommended by an affiliate, it is reviewed by the appropriate staff group of Jersey. Final decision is made by the Board of Directors acting upon the expert analysis of a project developed by competent personnel in the staff groups and in the lower echelons of the affiliates. Where Jersey does not have an organization or a department staffed for the expert analysis of a proposed project which appears to be worth considering outside consultants are engaged. Basically, the Board of Directors fixes the guide lines for investment programs and objectives and relies, in making final decisions, on the information which is developed and flows to it from its advisory groups.[5]

3. Testimony of Mr. Rathbone, Chairman of the Board of Directors.

4. Testimony of Mr. Rathbone, Chairman of the Board of Directors:
   "* * * Actually the Board advisory Committee consists of the chief executives of practically all of our major and important staff groups. There would be such groups as the producing group, the transportation group, the refining group, the marketing group, chemical group, and another group which we organized a few years ago called the new investments group and the heads of these groups constitute the bulk of the membership of the Board Advisory Committee."

5. Testimony of Mr. Rathbone, Chairman of the Board of Directors:
   "A. Well, we have a very clear-cut and written documentation of our investment programs and objectives. This basically is the biggest and most important job that the Jersey Board has, to invest the stockholders' money to try to make as good a return on that investment capital as they can, and to preserve the security of principal. This is our main job. In order to discharge that job properly, we found some time back that we should have—May I go back just a moment?
   "The way in which we make these investments is to ask our affiliated companies, and our staff groups, to generate investment ideas, because obviously fifteen men, sitting up in New York, are not going to be able to generate nearly as many ideas about investment as a hundred thousand people scattered over the world are. So we invite and really request rather strongly that our people all around the world generate investment opportunity ideas. And in order to give them some guidance so that we are not chasing rab-

Esso Chemical Company (Esso) is a corporate advisory and study organization wholly owned by Jersey. It does not operate any business. It came into being to expand Jersey's chemical operations by adding to the product lines and to strengthen Jersey's position in the agricultural markets. Its function and purpose is to advise Jersey with respect to interests and investments in the chemical fields which include potash and fertilizers. It has an agricultural chemical division. It functions as a staff organization in corporate form to initiate recommendations and to review any proposal for a chemical venture made by any affiliate company. This corporation was organized in 1963 by combining several other companies of the Jersey organization working on chemicals. Study and analysis of all chemical activities of a commercial nature presently in existence or proposed are now combined in Esso.[6]

Jersey Production Research Corporation is a corporate entity wholly owned by Jersey. It has the responsibility to conduct research for prospective oil deposits and to bring to the attention of Jersey any other mineral deposits, including potash and phosphate, which are discovered during the course of the discharge of its primary function of exploration for oil.

Esso Research and Engineering Company has been described as the "principal research arm of the Jersey family."[7] It not only includes research on a broad scale in connection with petroleum, petroleum processes and petroleum production, but also conducts research in other fields. It covers a broad field of research on behalf of Jersey in contrast to the specialized field in which Jersey Production Research Corporation operates.

Esso Exploration Company is another fact finding corporation whose responsibility to Jersey is to explore the possibility of oil deposits in various parts of the world where Jersey does not have an existing affiliate company operating. This corporation is managed by a staff department of Jersey known as the Producing Coordination Department. The five regions of the world to which the investment interests of Jersey extend are

bits all the time, we draw up some investment objectives, some guide lines for them. When we are going into a new field we don't want to depreciate the return on invested capital in the oil business."

6. Testimony of Mr. Rathbone, Chairman of the Board of Directors:
    "Q. Does Esso Chemical have any responsibility for making recommendations as to the entry into new chemical enterprises?
    A. Yes, sir. That is one of its prime responsibilities.
    Q. Does a part of that responsibility include or does it not making recommendations with respect to the commercial aspects of proposed new ventures in the chemical industry?
    A. Oh, yes. Its responsibility is to survey the field of chemical activities broadly, to make recommendations through our usual channels of recommendation to the Board of Directors that such and such an investment in such and such a chemical activity would be in their opinion a good venture for us to consider."
    \* \* \* \* \* \*
    "Q. Mr. Rathbone, I believe when you were speaking in terms of Esso Chemical you stated that Esso Chemical was more or less an advisory group, I believe, to the executive committee and to the Board of Directors of Jersey, is that correct, sir?
    A. That is correct.
    Q. Does it also act in an advisory capacity to your various affiliates or subsidiaries?
    A. Yes. We have, as I think I testified before, quite a substantial number of advisory groups in the parent company. One of our principal functions in the parent company is to advise affiliates with these various expert staff groups. The advice is frequently sought by the affiliate. In fact, they know that these advisory groups are there and that they are available to them for consultation and advice and they use them very freely.
    Q. And this is really the job responsibility of Esso Chemical Company?
    A. And in the chemical field Esso Chemical has this responsibility. This is organized as a corporation rather than as a Jersey staff group, as I mentioned before, for various tax and legal reasons."

7. Testimony of Mr. Rathbone, Chairman of the Board of Directors.

the United States, Canada, Latin America, Europe, Africa and the Far East. Jersey has on its Board of Directors a contact director for each of the various production classifications such as chemicals, refining, etc. This director maintains contact on a world-wide basis for the particular producing function for which he has responsibility, and he works together with a regional contact director. For example, Mr. H. W. Fisher, Vice President and member of the Board of Directors of Jersey, is the contact director in the chemical field. Mr. J. F. White is the regional contact director for Canadian operations. According to the testimony of Mr. Rathbone, Chairman of the Board of Directors of Jersey, these two men would function together in bringing any matter of proposed investment in the chemical field to the attention of the BAC, the Executive Committee of Jersey and, finally, to the Board of Directors of Jersey in the manner and subject to established policy with respect to corporate capital investment program processing.[8]

The principal industrial producing affiliates of Jersey identified in ranking order of significance for furtherance of Jersey's interest in potash and fertilizer industries are: (1) Imperial Oil, Limited (Imperial) is the largest integrated oil company in Canada. In 1963 its revenues exceeded $1 billion. Its market extends from coast to coast in Canada. In addition to its sale and distribution of petroleum products, it has also, among other things, engaged in the sale and distribution of mixed fertilizers. These mixed fertilizers are obtained by purchase from a manufacturer. Seventy percent of Imperial's stock is owned by Jersey. The remaining 30% of stock interest is widely held by the public. Jersey votes its shares of stock in Imperial every year for the election of Imperial directors. Proposed items in excess of $300,000 in the fiscal capital budgets of Imperial are referred to Jersey for comment.

(2) Humble Oil and Refining Company (Humble), a petroleum company operating in the United States, is a wholly owned subsidiary of Jersey.

(3) Enjay Chemical Company (Enjay) is a wholly owned subsidiary of Humble engaged in the United States in the operation of a petrochemical business.

(4) International Petroleum Company (International) is a wholly owned subsidiary of Jersey. It is an oil producing and marketing corporation operating in the Caribbean area. International and Esso collaborated on the studies which led to the entry by Jersey into the production and sale of mixed fertilizers in the Caribbean area. A more detailed discussion of Jersey's interest in the mix-

8. Testimony of Mr. Rathbone, Chairman of the Board of Directors:

"Q. If a chemical matter dealing with Canada came up, then, it would eventually, if it ever reached any dignity or magnitude, would eventually end going through Mr. Fisher and Mr. White?

A. That is correct, yes, sir. They, between the two of them, would decide which one would take the lead in presenting it to the executive committee.

Q. How would Mr. White and Mr. Fisher fit in in presentation to the executive committee, the Board Advisory Committee?

A. Well, sir, actually we have a pretty well established and well understood routine with respect to capital investment program handling, and it is well known to everyone that if an investment project is planned to come to the Jersey Board for approval or disapproval that it should first go to the Board Advisory Committee for that review in depth and appraisal. And the way in which it gets there is that usually the management of the affiliated company, if it is an affiliated company, would advise his contact director, 'I have a proposal that I want to make for investment, will you present this, 'or have this presented, rather, 'to the Board Advisory Committee.' And then it goes to the Board Advisory Committee and the Board Advisory Committee will study it in some depth and usually the study, depending on how complicated the matter is, will require quite a bit of time, quite a bit of interchange of comment and information, figures of one kind or another back and forth between the affiliated company and the Board Advisory Committee until they have come to some sort of a meeting of the mind. Then the recommendation will come from the Board Advisory Committee through the contact director to our Board."

ed fertilizer business will follow under another caption.

The evidence leaves no doubt as to the fact that Jersey has the available expertise to discover and competently evaluate the potential of profit in new fields of capital investment; that it has embarked upon and emphasized a policy of continued economic growth consistent with maintenance of current percentage of profit return; and that it has the capital resources for acquisition of a profitable enterprise by purchase, or for the undertaking of large and long-term capital financing of a self-developed business deemed likely to enhance the ultimate overall profit return to its stockholders.

At the present time neither Jersey nor any affiliated company is engaged in the extraction of minerals from the earth (other than oil) or the processing thereof. Hence, the mining, processing, and marketing of potash would be a new venture enterprise for Jersey which Jersey contends would not be attractive to it except by acquisition of a company like PCA which has acquired experience and developed expertise in the field of mining, processing, and marketing of potash. Jersey denies that it has given serious consideration at the top echelon of management to a self-developed or "grass root" project in the potash industry.

## PCA

PCA was organized during 1931. It started to produce potash in 1934 and has been and still is engaged almost solely in the business of exploring for, mining, processing and selling potash. Among the nine companies producing potash in the United States it is the largest producer. It ranks second in North American production. In terms of total current revenues and net profit after taxes *from the sale of potash* it ranks among the most successful companies in the potash industry occupying an enviable position in that field.

PCA has enjoyed continuous and profitable growth over the years and during the fiscal year ending June 30, 1964 its earnings and total assets were reported at record levels. Sales totaled $23,279,153 and net profits after taxes amounted to $3,171,609. It had total assets in the amount of $54,330,667 and a net worth of $40,224,794.

Mining and processing of potash by PCA has been conducted in New Mexico in what has been described as the Carlsbad area. Facilities there, owned and operated by PCA, have potential production capacity of approximately 1,000,000 tons of KCl annually or approximately 600,000 tons $K_2O$. It has been producing and selling almost at capacity [9] and has enjoyed a ready market for all the potash that it had potential capacity to produce. From the evidence this also seems to be true as to its competitors.

During the year 1950, PCA began to explore for potash in Saskatchewan, Canada. An ore body was delineated in the Saskatoon area in 1953 and operations were begun to construct a mine shaft and a surface plant. Work on this was completed during 1958 and limited mining operations were begun and continued un-

9. Testimony of Mr. Hall, President of PCA:

"Question: What is the capacity of your Carlsbad operation?

Answer: The product, about a million tons of product annually. Muriate of potash.

Question: That comes to around 600,000 tons in terms of $K_2O$?

Answer: That's right.

Question: What is your production rate at present, say, for 1964?

Answer: It is approaching that. We had a few shutdowns that occurred. I think in all of the fiscal 1963–64, it was 980,000 tons. You don't quite always reach the level. You have breakdowns and so forth.

Question: You are practically producing to capacity?

Answer: Yes.

Question: How about sales, are you selling everything you produce?

Answer: Yes.

Question: Is this, as far as you know, an industrywide situation that the industry is producing at capacity?

Answer: As far as I know, it is true, Yes."

til November 1959 when damage due to water seepage into the mine shaft necessitated extensive repairs and a shutdown. It was further found during the short period of operation that the existing concentrating facilities were inadequate to remove insolubles from the ore. Further work was done to secure the mine shaft and to modify the surface installation. During trial it was anticipated that PCA would be able to resume its production at Saskatchewan during March 1965.

PCA's undertaking to mine potash in Canada was a pioneering operation. A shaft was sunk to a greater depth than had ever been previously undertaken and unforeseeable problems of water seepage were encountered. There is evidence that these problems which PCA encountered with the mine shaft would not recur with PCA or others because of knowledge gained by PCA's experience.

The total capital cost of PCA's Saskatchewan facilities amounted to approximately $43,500,000. The plant has a present capacity of about 600,000 tons of muriate of potash annually and a potential for increased production when and if a larger concentration facility is built. It is anticipated that production costs will be less in Canada than in New Mexico and that the ore body, on the basis of prospective rate of production, will, on a conservative forecast, last at least a hundred years. PCA has been one of the lowest cost producers in Carlsbad and it is anticipated with the operation of its Canadian mine that it will achieve a production cost basis comparable to that of the lowest cost producer in the world.

PCA has large and rich potash ore reserves in both the United States and Canada and a time advantage of at least five years in conventional shaft mining in Saskatchewan over any other competitor except International Minerals and Chemical Company, placing it in an excellent position to supply all of Jersey's present and future potash requirements. The facts as just mentioned were, among others, persuasive to Jersey in reaching its decision that acquisition of PCA was economically attractive.

The price offered by Jersey (850,000 shares of Jersey par value capital stock, the equivalent of $73,525,000) amounts to a premium of about 30% based on 1.26 million shares of PCA stock outstanding at a market value of approximately $45 per share. In addition to this Jersey was to assume long term debts of PCA in the amount of $15,000,000.

There is no dispute about the fact that PCA is a strong, active competitor in the production and sale of potash in the United States. During the year ending June 30, 1963 PCA had domestic sales of 760,419 tons of KCl and foreign sales of 134,462 tons. In the year ending June 30, 1964 it had domestic sales of 807,540 tons and foreign sales of 191,630 tons. Its domestic sales for the year 1964 represented 17% of total sales in the potash industry in the United States. This is based upon total United States sales of potash including imports. At time of trial it was estimated that its facilities in Carlsbad, New Mexico had been producing approximately 18% of total United States potash producing capacity. A distinction is made between potential and *actual* production.

It should be noted, however, at this juncture, in connection with resources and economic strength that while PCA is the largest producer of potash in the United States and is projected to be the second largest in North America, nevertheless, it is a small competitor in the potash industry when compared in terms of *total* net worth, revenues, and net profit after taxes.[10] It is only in the potash industry in which PCA is almost exclusively engaged that it holds a predominant position.

If Jersey acquires PCA, there would be no company presently engaged in the potash industry which would be substantially comparable to Jersey in terms of total assets, net worth, revenues, and net profit after taxes.

10. Moody's Industrial Manual; Moody's Utilities.

## THE POTASH INDUSTRY

Potash is generally found in bedded deposits of marine evaporites or naturally occurring brines. It is extracted from the earth by mining and is processed for commercial use in a surface concentration plant. The principal source of supply in the United States has been from the Carlsbad area of New Mexico where the resources are being rapidly depleted. It is estimated that the resources of potash there will be exhausted in less than 20 years.

In recent years it has been discovered that rich and virtually untapped potash beds are located in the Saskatchewan province of Canada, and the attention of the potash industry is being focused upon production there as the probable principal source of supply for the future needs of the markets in North America and abroad. The quality and the thickness of the ore beds in Saskatchewan, so far as is presently known, are much better than those in Carlsbad. However, the best ore beds known to exist at Saskatchewan are located at a greater depth from the surface of the earth than those in New Mexico, thus creating more serious engineering problems in mining. The evidence does not indicate, however, that there would be an ultimate competitive disadvantage.

There are two methods of mining the ore: conventional shaft mining and solution mining. Presently almost all of the potash produced in North America is recovered from underground beds by "room and pillar" conventional shaft mining. Generally a shaft with an inside diameter of approximately 16 to 18 feet is sunk to the level of the underground horizontal potash bed. The underground workings are extended from the shaft, usually in several directions. Not all of the ore from the beds can be extracted because a certain quantity must be left to support the overlying geological structures. The ore is brought to the surface by mechanical means, crushed, purified and concentrated to the point where it contains approximately 60% $K_2O$.

In connection with the depth at which potash can be mined by conventional shaft mining, it was stipulated at the time of trial that "no producer is now mining potash deposits at a depth of more than 3350 feet below the earth's surface by the shaft method. Potash Company of America plans to mine potash in Saskatchewan by the shaft method at depths up to 3465 feet. It is not now known whether it is possible to mine potash found at greater depths by the shaft method."

There are two methods of solution mining described as selective and non-selective. It was stipulated by the parties that "in a selective solution mining process a hot brine saturated with respect to sodium chloride but undersaturated with respect to potassium chloride is circulated underground and is intended to remove the potassium chloride from the underground mineral deposits. In a non-selective solution process a hot liquid undersaturated with respect to both sodium chloride and potassium chloride is circulated underground to extract both these chemicals." Solution mining can be conducted at greater depths than shaft mining.

Because the extensive rich deposits of potash in Saskatchewan are located at greater depths from the surface of the earth than may be feasible to mine by the shaft method, it is likely, as Saskatchewan comes to be the principal source of North American supply, that solution mining will of necessity be utilized to a considerable extent. The areas within which shaft mining can be successfully undertaken, so far as is presently known, are limited. The best ore beds seem from the evidence to be located at depths greater than 3500 feet from the surface of the earth. It has been determined that solution mining is technically feasible and that when some further technological problems are solved, the only difference between shaft mining and solution mining will be a matter of production costs. It has been reported that large scale production by the shaft method is more economical, but on small scale production,

avoidance of the initial expense of construction of the shaft mine would off-set the differential in production costs. Another favorable factor is the short period of time within which a solution mine can start to produce.

The feasibility of solution mining and a comparison of costs of shaft mining is set forth in a memorandum to W. E. Wallis of the Producing Coordination Department of Jersey by T. E. Gillingham a consulting mining engineer engaged by Jersey on a consultant basis.[11]

No doubt, in view of the cost differential on large scale production, solution mining will not be undertaken to a great extent until some further technological problems have been solved bringing cost production to a comparable basis with shaft mining, or until the demand cannot be satisfied by resources available for shaft mining. However, one company, Kalium Chemicals, Ltd., has entered into commercial production using a solution mining technique at its facilities in Saskatchewan. The first Kalium shipment of potash was made September 29, 1964. It should also be noted that other companies, including Imperial Oil, have experimented with solution mining and have not entirely rejected ultimate feasibility.

11. GX 77
*"Conclusions:*
1. Solution mining tests on Saskatchewan potash carried out by Imperial Oil Limited have shown that the technique is technically feasible, but the tests have not yet demonstrated that certain critical assumptions regarding brine concentration and flow rate, which have been used in preliminary evaluations, can be realized fully in practice. Definitive test work would require another two to three years, and the results to date indicate that definitive data would probably cause present cost estimates to be revised upwards, at least slightly.
2. Imperial's comparison of the costs of solution mining (based on the above mentioned assumptions) with the costs of conventional mining (based on current full-scale operations in the Saskatchewan and other potash fields) shows a significant margin in favor of the conventional mining approach. A preliminary cost comparison, which I have drawn up from Imperial's estimates, is shown in Table I. Complete economic analyses were not presented at the review, but we were informed that the analyses show a DCF return of 17 or 18 percent for solution mining and of at least 22% for shaft mining. No comparison is very meaningful, however, until definitive data on solution mining are available.
3. The greatest single item of cost in the solution method is the expense of evaporating the brine obtained from the solution cavities. Consequently, the maintenance of an adequate flow of brine of maximum potash concentration is a paramount problem and one *which has not yet been resolved from the economic viewpoint.*
4. The advantage that accrues to the solution method from the avoidance of expensive shafts applies only in the case of relatively small production: the advantage disappears when production rates are much above 1 MM tpy of KCl product.
5. It is conceivable that under certain circumstances a solution mining project might yield an acceptable rate of return, even though this rate would probably be less than that realized from a competitive conventional mine. *Such circumstances might include a specialized limited demand without a concept of growth, or an entry into production forced by the non-availability of ground suitable for conventional mining.*
6. Solution mining is the only known method of recovering the vast tonnages of potash lying deeper than about 3500 feet in the Saskatchewan field, but there are sufficient tonnages of potash lying above this depth, and suitable for conventional mining, to supply the probable demand for many decades.
7. In my opinion, a solution mining project would be a hedge against the very improbable, but possible, occurrence of widespread catastrophic roof failure and flooding in conventional mines.
*Recommendations:*
1. It is my impression that a finished economic study, which will probably be prepared by Imperial, will show a sufficient margin in favor of conventional mining to justify abandonment of the solution mining project as an early production goal.
2. There may be reason to continue the solution mining tests on a research basis, at least until certain questionable points are cleared up, and until Jersey's course in potash is determined." (Emphasis supplied)

Based on past experience, it seems clear that at least four to five years is required to construct a shaft mine and a surface concentration plant. Preliminary to this is the exploratory work of locating the ore reserves by drilling test holes. Because of the amount of initial capital investment and the period of time before production can begin, entry into the potash industry by shaft mining is limited to companies with substantial capital resources. In lesser degree the same is true of solution mining.

The companies now engaged in North American production in this country and Canada, with date of entry into the industry and with current production or imminent potential production, are shown on the following chart:

| COMPANY | DATE OF ENTRY | LOCATION | PRODUCTION (TONS KCl OR EQUIVALENT) |
|---------|---------------|----------|-------------------------------------|
| American Potash & Chemical Corp. | 1916 | California | 350,000 |
| U. S. Borax & Chemical Co. | 1931 | New Mexico | 867,000 |
| Potash Co. of America | 1934 | New Mexico | 1,040,000 |
|  | 1965 | Saskatchewan | 600,000* |
| Bonneville, Ltd. | 1938 | Utah | 100,000 |
| International Minerals & Chemical Corp. | 1940 | New Mexico | 665,000 |
|  | 1963 | Saskatchewan | 1,600,000** |
| Duval Corp. | 1951 | New Mexico | 551,000 |
| Southwest Potash Corp. | 1952 | New Mexico | 1,000,000 |
| National Potash Co. | 1957 | New Mexico | 450,000 |
| Kalium Chemicals, Inc. | 1964 | Saskatchewan | 650,000 |
| Texas Gulf Sulphur | 1965 | Utah | 550,000 |

\* Scheduled at time of trial to begin production in March 1965 with indicated capacity.

\** Production prior to completion of expansion program at Carlsbad which at the time of trial was scheduled for completion in March or April 1965.

It will be noted from the foregoing that the production of potash in North America is concentrated in ten companies and that of these only two, PCA and International Minerals and Chemicals Corp., have production capacity in excess of 1,000,000 tons of KCl annually. Parenthetically, it should be noted that upon completion of its expansion program at Carlsbad, Southwest Potash will probably come within that class. It may also be noted that this number of companies was developed slowly over the period from 1916 to 1965. Production of potash is an industry in which present concentration is substantial.

There are, however, other potential entrants into the field. Kermac Potash Company which is owned 50% by Kerr-McGee is engaged in the construction of a potash mine and concentration plant in the Carlsbad area and its project was expected to begin commercial operations in 1965 with a designed capacity of 1,500 tons of KCl per day. Kerr-McGee also holds potash exploration permits in Saskatchewan. Alwinsal, a French potash company, began construction of a shaft at Saskatchewan during 1964 and expects to be in production during the year 1969 with forecast of annual capacity of from 550,000 to approximately 1,000,000 tons

of KCl. United States Borax and Chemical Co., Homestake Mining Company and Swift and Co. are planning a joint venture to construct a potash mine and plant in Saskatchewan with capacity of 1,500,-000 tons of KCl annually. The evidence indicates that this project will involve a total investment of about $66 million over a period of four or five years. On January 25, 1965 Consolidated Mining and Smelting Co. of Canada, Ltd. announced plans to develop its potash producing property in Canada with planned production at the rate of 1,000,000 tons of KCl annually. Forecast of capital investment is $65 million and the project is scheduled to begin production in 1969 or 1970. Noranda Mines, Ltd. announced plans to proceed with a mining project at Saskatchewan on February 22, 1965. The planned productive capacity is 1,200,000 tons of KCl per year with production expected to commence in 1969.

According to the American Potash Institute, shipments of potash for agricultural purposes for use in the continental United States totalled 2,839,965 tons $K_2O$ (4,733,275 tons KCl) in the year ending June 1964 compared to 2,535,344 tons $K_2O$ (4,225,573 tons KCl) in the year ending June 1963 and 2,236,405 tons $K_2O$ (3,727,342 tons KCl) in the year ending June 1962. Of these totals 260,676 tons $K_2O$ were imported in 1964 as compared to 276,525 tons $K_2O$ in 1963 and 238,803 tons $K_2O$ in 1962.

The forecast is a continuously increasing demand for potash in the United States as well as abroad. Growth in population with accelerating and urgent need for more agricultural food products, particularly in underdeveloped countries, plus emphasis in agricultural studies and recommendations on the value of good fertilizers for optimum plant growth account for the forecast of annually increasing demand for potash, nitrogen and phosphate both in the United States and abroad.[12]

According to the U. S. Bureau of Mines Minerals Yearbook for 1963 on Potash, world production of potash increased from 9,400,000 tons $K_2O$ (about 15,600,-000 tons KCl) in 1959 to about 12,000,-000 tons $K_2O$ (about 20,000,000 tons KCl) in 1963. Production in the United States during the same period increased from about 2,383,000 tons $K_2O$ (about 3,971,000 tons KCl) to about 2,865,000 tons $K_2O$ (about 4,775,000 tons KCl). Continued growth in the United States demand ranging from 5% to 10% per annum is expected over the next several years. Demand in the rest of North America and Central America, South America, Oceania and the non-communist Far East, considered collectively, is projected to be approximately 1,710,000 short tons ($K_2O$) in 1965 and to grow at a rate in the range of 9% to 10% per annum over the next several years; demand in Africa and the Near East is projected to be approximately 180,000 tons ($K_2O$) in 1965 and to grow at a rate in the range of 12% to 13% per annum over the next several years; and demand in Western Europe is projected to be approximately 4,720,000 short tons ($K_2O$) in 1965 and to grow at a rate in the range of 4% to 5% per annum over the next several years.

It has been estimated by defendants that the potash requirement of Jersey's overseas fertilizer plants for 1965 will be 87,000 tons $K_2O$. The projected potash requirements of Jersey's present and planned overseas fertilizer plants will

12. Excerpts from a document captioned "Ammonia and Fertilizer Opportunities" dated November 2, 1961 and found in the files of the Refining Coordination Chemicals Department of Jersey:

"Population increases have led to greater demand for food and fiber. This demand has led to an increased pace in agricultural and fertilizer technology. The utilization of new techniques and the more efficient use of more efficient fertilizers are constantly increasing the yield of the world's agricultural production and narrowing the historical gap between agricultural product supply and demand. Both increased acreage under cultivation and higher yields per acre are removing plant food nutrients during harvest in large amounts. These have had to be replaced. Reclaimed and irrigated wastelands have had to be fertilized to provide the plant foods lacking."

amount to 168,000 tons $K_2O$ in 1971. In addition to these estimated requirements, Jersey includes an additional 102,000 tons $K_2O$ for possible potash requirements of overseas fertilizer plants which may be planned for operation in the future.

Considered in terms of the world-wide market, there is presently a shortage of potash for export from North American sources. United States producers sell potash for consumption, not only in the United States, but also in the rest of the Free World. Therefore, the market in which the potash producers must compete is measured by consumption in the United States and the rest of the Free World.

It is estimated that currently planned increases in North American production by present producers and announced new North American production by companies not now engaged in the production of potash in North America will, by 1970, result in North American potash producing capacity of between 15 and 16 million tons KCl. According to the American Potash Institute, North American potash consumption in 1970 will be between approximately 7 and 10 million tons KCl. Based on these estimates, which in the light of all of the evidence the Court considers conservative, North American potash production (capacity to produce) will, by 1970, exceed North American potash consumption by between 5 and 9 million tons of KCl. But it seems on the basis of the evidence available and taking all estimates of productive capacity at face value, that after 1971 demand for potash will catch up with supply. In a memorandum dated February 24, 1964 by D. A. Benfield, Imperial Chemical Products Department, (signed by L. R. Muir of that department) addressed to Dr. W. W. Stewart, Manager, Development Division, Chemical Products Department of Imperial, world potash supply and demand trends were re-evaluated and summarized as follows:

"The potash industry is buoyant and will show healthy growth.

"The over capacity situation which presently exists will be continuously reduced as demand catches up with supply.

"It is very important that Imperial establish its operation at an early date (in production by the first of 1966) to secure our competitive position in the market place before other new capacity is built to cope with anticipated demand beyond 1970. The steady demand can be expected to minimize the effect of over-supply on price, but pressure on higher cost producers will develop.

"It is imperative that Imperial have a low cost mining and recovery process comparable with that of the strongest competition."

It is quite likely that North American potash companies will supply a substantial part of the annually increasing foreign demand. World supply of potash, on a conservative estimate, may exceed world demand by 1,020,000 tons $K_2O$ by 1971, but whether the continually increasing demand both in the United States and abroad will ultimately exceed available supply is an open question. The positive fact is that demand will continually increase. Whether there will be any developments in the next six or seven years resulting in increased productive capacity over and beyond what is presently projected is purely conjectural. There is no evidence to support an inference that such might occur. There is, however, evidence that previous forecasts of the extent to which demand would increase have been highly inaccurate. There is also evidence that at present potash is in "tight supply" and that this circumstance of the market has kept prices up. Mr. Dean Gidney, Vice President of PCA in charge of sales, testified:

"Question: Has the potash market expanded beyond your expectations at the time that you were making prognoses in 1960 or 1961 or 1962?

Answer: It most definitely has.

Question: What form has that taken or what magnitude has that been?

Answer: It has expanded much more rapidly—consumption has expanded much more rapidly than I figured. I would say it almost doubled the rate that I had anticipated.

Question: This is since 1962?

Answer: 1961, 1962, yes, sir.

Question: Have the prices held up?

Answer: Yes, sir.

Question: What has been the price range since you have been with Potash Company of America?

Answer: The low, I believe, was thirty cents a unit.

Question: When was that?

Answer: That started in 1957–1958. It carried over into 1958–1959 and perhaps in 1959–1960 it was slightly higher. The comparable price now is 36 cents a unit. This is comparing the low price during the lowest price period of the lowest price product.

Question: For each period?

Answer: Yes, sir.

Question: What have been the factors which were keeping these prices up?

Answer: The primary factor is that potash is in tight supply."

Despite the fact that potash has been in "tight supply" in the United States market, competition has become moderately virile in recent years, and PCA and its few large competitors have been the vital motivating factors in maintaining the competition.

Commitments of the potash producers to the fertilizer companies for the sale of potash are usually for a term of one year, and price lists are revised annually. During seven of the years preceding 1965 it became necessary to revise initially published price lists in order to meet competition. Prior to 1957, prices were carried forward from year to year indicating that there may have been little, if any, competition. Mr. Dean Gidney testified that PCA prepares a price schedule for each twelve-month period. Referring to this and to the price list published by other potash producers, he stated in connection with the development of competition:

"A. In general, the final price lists published by each potash producer for a contract year are the same in price. The prices quoted by the competitors are finally the same.

Q. What do you mean by saying "finally the same"?

A. In many years it has been necessary for one or more companies to issue revised price lists to meet competition created by a lower price list as put out by a competitor. 'Final' means the final revised price list for each company.

Q. Taking some period of time—well, take for example the last ten years, do you know in how many of those years companies issued revised price lists after having first issued an initial price list?

A. In seven of the last ten years it was necessary for some companies to issue revised price lists. I might qualify that by saying that at one period the prices were carried forward from one year to the next year, so that is one of the three years in which there were no revisions.

Q. Taking Defendant's Exhibit 51, selecting some year there as an example, can you give us an example of the year in which revised price lists were issued by a company?

A. I might choose this most recent year, sir, the year 1964–'65 in which we are presently engaged. The first price list issued by any potash producer this year was issued by International Minerals & Chemical Corporation, which price list represented an increase over the prices quoted last year.

Following IMCC's price list U. S. Borax Company issued a price list very similar to that of IMCC. Subsequent to that Potash Company of America issued a price list which was lower than the price list issued by International Minerals in some respects. Very shortly thereafter Southwest Potash

Company issued a price list which was still lower in some respects than that issued by Potash Company of America.

Following Southwest's price list it was necessary for Potash Company of America to issue a revised price list meeting their competition.

International Minerals & Chemical did the same. The other producers, Duval, Texas Gulf Sulphur, Kalium and American Potash Chemical Company issued similar price lists."

■ Profits in the industry are high and the margin of competition is not great. In this structure of the market a relatively small anti-competitive effect may substantially lessen competition. On the basis of presently projected production and demand, it is reasonable to infer that a highly competitive market may not come into existence until at least 1969. The continuance of it for more than a few years thereafter would depend upon increased production not presently foreseeable.

## JERSEY'S INTEREST IN POTASH

The interest of Jersey in potash developed after it became involved in investment in the fertilizer business. Investment in that business was a logical step in diversification. Other oil companies including Cities Service, Continental Oil, Socony-Mobile and Gulf Oil have also entered the fertilizer industry since World War II.

The logical motivating factor for expansion into the fertilizer industry is that reformed gas, a product of the oil industry, is a source of ammonia. Ammonia, in turn, is a source of nitrogen, one of the three primary plant nutrients used in fertilizers. As early as 1956 Jersey became interested in the production of nitrogen in Peru and during 1959 it decided to invest in the construction of an ammonia plant in Cartagena, Colombia.

As of the end of 1964, affiliates of Jersey owned in whole or in part fertilizer plants producing mixed fertilizers located in Aruba, Colombia, Costa Rica, El Salvador, Jamaica, Puerto Rico, and St. Vincent. Furthermore, affiliates of Jersey are constructing or have definite plans to construct additional plants for the production of mixed fertilizers in St. Lucia and Jamaica. There are also plans for the construction of plants in Lebanon and the Philippines and in other locations.

A subsidiary of Jersey owns in part a fertilizer plant in Spain for the production of ammonia. Jersey is also constructing or has definite plans to construct other plants which are not mixed fertilizer plants. A distinction is made between plants which are producing or which will produce mixed fertilizers and those which are producing or which will produce nitrogen and related nitrogen fertilizer products. The distinction is made because plants which do not produce mixed fertilizers have no need for potash unless it is decided to expand operations of such plants into the manufacture of mixed fertilizers. It is a likely inference from the evidence that in most instances wherever Jersey invests in the fertilizer business, it will ultimately produce mixed fertilizers.[13]

---

13. Testimony of Monroe Jackson Rathbone, Chairman of the Board of Directors and Chief Executive Officer of Jersey:

"Q. I think you have testified that when you went into the ammonia business —the fertilizer business just from the ammonia standpoint, you eventually discovered that it was desirable to have a full line of fertilizer product.

A. That's right.

Q. And that is the reason that you moved into the mixed fertilizer field. Did that come about by virtue of the fact that your customers are the same—that is, the same customers you sell as the ammonia type or nitrogenous fertilizers to you would be selling the other type?

A. No, sir; this came about by the fact that we learned something we didn't know at all before in the oil business. When we got into the fertilizer business to start with, the ammonia fertilizer, we employed several agronomists, experts in this field. I can't tell you where they came from, but they were experts. They were very good men. And as soon as we got hold of these fellows they pointed out to us the fact that there were such different

The total investment of Jersey in fertilizer plants as of January 15, 1965 was approximately $90,300,000. Further investments under consideration as of February 3, 1965 [14] would exceed $132,-000,000 not including a proposed mixed fertilizer plant in Australia. ($95,000,-000 in the Netherlands, Spain and El Salvador and $37,000,000 in Malaya, St. Lucia, Jamaica, West Pakistan, Lebanon and the Philippines.)

Jersey purchases potash for its mixed fertilizer plants on annual contracts the same as other fertilizer companies. There was a substantial increase in tonnage purchased during the first nine months of 1964 as compared with the year 1963. The annual tonnage required will continually increase to meet the future needs of Jersey's expanding fertilizer business. The fertilizer business is profitable and future expansion by Jersey can be anticipated wherever an advantageous market and location presents itself. During 1963 and 1964 Jersey's purchases of potash were spread among PCA, Southwest Potash Corporation, Potash Export Association and International Metals and Minerals. Prices are uniform and the evidence supports a reasonable inference that the limited quantity of potash which Jersey acquires annually from each supplier is attributable to the fact that no single one can supply all of Jersey's needs consistently with its other customer commitments.

It has been previously noted that Jersey estimated its potash requirements for the year 1965 to be 87,000 tons $K_2O$. It projected its requirements to the year 1961 estimating a definite quantity of 168,000 tons $K_2O$ and a possible additional amount of 102,000 tons to meet requirements of new fertilizer plants not presently planned. This, in the potash industry, is a short-range projection made in connection with the desirability of acquisition of PCA. In the same document prepared by Esso Chemicals for review by the BAC for this acquisition it was stated:

*"Short-Range Picture*

\* \* \* [A]ccording to the Potash Export Institute, there is now an actual shortage of potash for export from North American sources, and even the domestic demand is being barely balances [sic] by full production at Carlsbad and by increasing imports from IMC's Canadian mine. Indeed, potash prices were increased on July 1st by an average of 7–8%.

"What is the reason for the present tightness of supply and demand?

"In the first place, the new plants did not come onstream as predicted; in the second place, there is reason to think that the growth rate of potash consumption in this decade may be higher than anticipated, though perhaps not as high as it was in the previous decade."

\* \* \* \* \* \*

"It is significant that every large potash project in North America in the past decade has been delayed for one reason or another, and that every temporary surplus of production has been sold within a year. It is also significant that 4.5 years is about the minimum time required to bring a new

---

requirements for different types of fertilizers, in connection with different parts of the world, that if we were just going into the ammonia fertilizer business alone, the urea, or even the liquid ammonia, that we were going to limit ourselves very severely in our ability to compete with others who had a full line, because there are some crops that take ammonia, or urea, and some that take mixed fertilizers, and some that take different mixtures of the two. And the requirements vary from year to year as well as from crop to crop and from geography to geography.

So they persuaded us rather quickly that we were fighting with one arm tied behind our back in the fertilizer business if we didn't go to the full line.

Q. Isn't it also true that when you call on customers with less than a full line that you are at a disadvantage with other companies that might be able to offer that same customer a full line of a given product?

A. That is just what I said; yes, sir."

14. Date of filing stipulation.

Canadian conventional mine onstream, so that it is unlikely that there will be any Canadian conventional mine, other than IMC and PCA, in operation before 1969, at the earliest."

It was also noted in the same Esso report to the BAC dated August 14, 1964:

*"General Long-Range Picture*

A gradually increasing need for fertilizers is undeniable: the inexorable growth of world population will create in 35 years a need for twice today's food production—assuming that people will be fed at the minimum recommended nutritional level. Unless vast new acreages of Canadian and Siberian podsols and tropical lateritic soils of very low fertility are brought into cultivation—a rather unlikely development—the new food requirements must come from present pastures and cultivated lands plus the rather limited acreages that can be brought economically under irrigation. Much gain can be expected from improved plant strains and pest control, but the great burden of increased food production must fall upon balanced fertilizers. The trend is already evident in the U. S., where, as land use becomes more selective, the yields per acre are being doubled by sophisticated plant breeding and fertilizing with nitrogen and mineral fertilizers. Inevitably, lands now lying fallow because of their submarginal fertility will come back into cultivation—but only with heavy applications of fertilizer. Even at present growth rates, fertilizer requirements will double in 25 years. While much the same picture can be hypothecated for several raw materials, such as copper or lead, for example, the fertilizer raw materials seem almost uniquely free of the threat of substitution and of dependence upon industrial growth."

So far as the evidence discloses, the projected rates of consumption of potash by Jersey are based upon requirements of overseas mixed fertilizer plants. Consideration does not seem to have been given to entry into the mixed fertilizer business in the United States. It was contended at trial on behalf of Jersey that it was not particularly interested in getting into the mixed fertilizer market in the United States because of the competition. But it must be noted that since 1962 Jersey has studied the possibility of acquiring United States fertilizer companies. It bid $75 million to acquire the assets of Agricultural Chemicals Company, the second largest mixed fertilizer company in the United States. The offer was refused. It was prepared to pay up to $95 million for the Virginia-Carolina Chemical Company, another United States mixed fertilizer company, but no agreement could be reached. Other acquisition possibilities in this field which were studied by Jersey were International Minerals and Chemicals Corporation, Smith-Douglass, Royster-Guano, Spencer Chemical Company, and Texas Gulf Sulphur Company. In the light of this interest shown in the mixed fertilizer industry in the United States, the probability that Jersey will ultimately enter cannot be ruled out. The question is only one of when the advantageous opportunity for profit will be presented.

The net profit return from Jersey's mixed fertilizer business is high and the evidence indicates that the business will continue to be profitable to and beyond the year 1971. Accordingly, it is reasonable to infer that expansion will continue beyond that date with construction of new fertilizer plants. The history of the development of Jersey enterprises supports the conclusion that so long as the profit rate is attractive, further investment of capital will be made to increase production.

It should also be noted that Jersey's interest in acquiring its own source of raw materials for its fertilizer business is in keeping with a recent trend toward backward integration in the fertilizer industry. At present there is only one company in the mixed fertilizer business, International Minerals and Chemicals Corporation, which has its own source of supply of nitrogen, phosphate and potash. The Consolidated Mining and Smelting

Company of Canada, Ltd., also in the mixed fertilizer business and marketing a substantial part of its mixed fertilizer in the United States through a wholly owned subsidiary, Cominco Products, has both phosphate and nitrogen and intends to mine for potash. Other mixed fertilizer companies have become self-sufficient in two of the three plant nutrients primarily by acquisition. The testimony of Mr. Hall, President of PCA, as to this recent development in the mixed fertilizer business is quoted as follows:

"Question: Is there anybody in the industry that has their own nitrogen, phosphate and potash and is a mixed fertilizer producer and seller as well?

Answer: International Minerals is in the mixed fertilizer business. They have nitrogen and phosphate and potash.

Question: Is there anybody else?

Answer: No.

Question: Are there mixed fertilizer companies that would be basic in two of these three nutrients that you mentioned?

Answer: Yes.

Question: Is this a more recent development in the industry?

Answer: Yes, I would say it is. It has been so in the past four or five years.

Question: Is the converse also true, that firms that are basic in these nutrients go into mixed fertilizers?

Answer: Not particularly. I would say generally not. There has been some, if you want to call it backward integration.

Question: What do you mean?

Answer: They are in the nitrogen business, then might get into the fertilizer business. Is that what you mean?

Question: Yes.

Answer: Yes.

Question: I take it from your answer, most of the integration has been the other way, fertilizer firms becoming basic?

Answer: Through acquisition, primarily.

Question: Is there also a trend toward firms becoming basic in more than one of these primary nutrients?

Answer: They are attempting to, yes."

The desirability of backward integration by Jersey was suggested by Siro Vazquez, head of Jersey's Producing Co-ordination Department in a momorandum to Mr. H. G. Mangelsdorf, President of Esso Chemical dated August 11, 1964. In that memorandum it was stated:

"Three points have bearing on this matter of potash minerals production. First, our studies indicate that the producing function tends to be the most profitable portion of the fertilizer business, which suggests the desirability of integrating backward to raw materials production. Further, owing to the large capital costs necessary to get into potash production in Canada, the DCF [discounted cash flow] is greatly improved by achieving large and maximum production very early in the life of the project. Thirdly, it is possible to establish consortiums of joint producing companies which will permit even a relatively small consumer to reap the advantages of large production. The terms under which these consortiums operate can be flexible and indeed might be written in such a manner as to protect Jersey should it ever find it desirable to increase its production enormously."

Jersey's intention to acquire, if possible, its own source of raw materials for its fertilizer business is further corroborated by the interest shown in acquisition of phosphate. It considered phosphate deposits in Peru, Jordan, Africa and the Spanish Sahara. In the United States it examined phosphate possibilities in North Carolina, South Carolina and Florida. It has option rights on phosphate bearing areas in Utah which are presently held by Enjay Chemical Company, a wholly owned subsidiary of Humble.

A presentation to the BAC by Esso Chemical Company, Inc. on the desirability of the acquisition of PCA dated August 18, 1964 recites among other things:

"If an attractive avenue can be found, Jersey desires to enter into production of phosphate and potash raw materials to supplement nitrogen production."

R. L. Brown, Jr., Secretary of the BAC, commenting on BAC approval of acquisition of PCA wrote on August 17, 1964:

"BAC noted that Denver's* highly mechanized mine in Carlsbad produces low cost ore of high quality and that the associated flotation plant is one of the best in the world. Nevertheless, this mine's economic life is estimated at only 17 years at current production rates and higher production rates and/or increased competition from lower cost Canadian ore could shorten this life.

"BAC agreed that one of Denver's most attractive features is the existence of the Saskatoon shaft. Experience has shown that at least 4 to 5 years are required to complete such a shaft thus guaranteeing a delay of that magnitude before any new Canadian production could come on-stream. In reality, the time period might even be longer since delay in bringing new facilities into production has been typical of this Industry in the past. *BAC concluded that the best Canadian alternative to acquiring an existing Saskatchewan potash mine would be to start a grass roots potash operation there, either singly or as a member of a consortium. Such a course of action would necessitate accepting a 5-year delay before a shaft could be completed and production started."* (Emphasis supplied) (*Denver is the code name for PCA)

The foregoing provides a background of the nature and extent of Jersey's interest in potash leading up to the question of whether such interest was sufficiently compelling to conclude that in the absence of acquisition of PCA, Jersey would probably enter the potash industry on a "grass roots" basis.

## MANIFESTATIONS OF JERSEY'S INTEREST IN ENTERING THE POTASH INDUSTRY ON A "GRASS ROOTS" BASIS IF OPPORTUNITY FOR ADVANTAGEOUS ACQUISITION DID NOT PRESENT ITSELF

Documentary evidence found in the files of Jersey departments and affiliates from at least 1959 (the date of interest shown by Humble to which reference will hereinafter be made) to August 1964, leaves no doubt that serious and continuing consideration was given by Jersey to self-development in the potash industry if entry by acquisition were not possible. During 1959 and 1960 Humble encountered potash deposits in Chavez County, New Mexico. It acquired federal and state potash rights in the area and drilled fifteen exploratory core holes during 1960 and 1961. It was finally decided to abandon this project and the state and federal rights were permitted to expire. Humble also examined cuttings from holes drilled in Eddy County, New Mexico, and acquired federal potash permits there. It drilled two exploratory holes but again found the results unfavorable and abandoned its permits. Prior to 1962 Humble had also done a limited amount of exploration in the Moab area of Utah adjacent to the producing facilities of Texas Gulf Sulphur. The results there were not encouraging, and, as a consequence, Humble decided that it would not retain any properties except those which would entail only nominal expense. During 1962 and 1963 Humble made preliminary studies of potash deposits in the Williston Basin of Montana and North Dakota but the deposits proved too deep for conventional mining. In the year 1962 Colorado School of Mines Research Foundation undertook a study for Humble Oil to investigate investment opportunities of various non-petroleum minerals including potash and phosphate. Emphasis was placed upon good location and very high grade ore near the surface permitting low cost production.

It was considered during 1962 that Humble might provide raw materials including phosphate and potash for Jersey's Latin American fertilizer plants. During 1963 Humble gave consideration to joining with Peruvian Potash Company in the exploration of potash on certain property held by Peruvian, but this project was not pursued. Despite the fact that the efforts of Humble never reached the point where definite plans were formulated to bring a particular potash project into development, it nevertheless appears from the evidence that Humble, like other affiliates of Jersey exploring for oil, never abandoned the idea of locating and developing a profitable potash project.

In connection with the discussion which will follow, further reference is now made to Jersey departments and affiliates that make recommendations on investment opportunities in the chemical field. Recommendations as to the commercial attractiveness of opportunities in the chemical field are made to the BAC and Executive Committee of Jersey primarily by Esso. In evaluating such investment opportunities Esso receives technical advice from the Producing Coordination Department of Jersey, and at times receives assistance from Jersey Production Research Corporation. It also evaluates the reports of consultants and the recommendations made by other departments and affiliates of Jersey.

The Producing Coordination Department and Jersey's Production Research Corporation in a report filed with Jersey in August 1961 and captioned "Exploration and Production of Phosphate and Potash," pointed out that it would be advantageous to Jersey to have a source of raw materials for its fertilizer business and that acquisition should be considered either by purchase of producing properties or by discovery and, further, that Jersey geologists should include a search for potash and phosphate as well as for oil. This report particularly recommended exploratory work in 1962 and 1963 for potash and phosphate in the Philippines, West Pakistan, Peru, Vene-

zuela, Argentina, the United States and Canada. Potash projects in Libya, Ethiopia and the French Congo were also considered.

Jersey was approached by Homestake Mining in 1964 to determine Jersey's interest in participating in a joint venture with Homestake, U. S. Borax and Chemical, and Swift & Co. for development of a potash mining operation on lands held by U. S. Borax in Canada. Though such a project was considered, it was finally decided by Esso that Jersey should not participate in such a joint venture because Jersey would not have a controlling interest in the project and, further, because Jersey could not reach an affirmative decision within the time period fixed by the other parties.

A document captioned "Saskatchewan Potash Reserves" by C. M. Beamer, General Manager of Chemical Products Department of Imperial, prepared during 1962, with reference to planned fertilizer plants recited in part:

> "The economics of these currently proposed fertilizer plants has been based on the purchase of phosphate and potash on the open market. A Jersey source of these raw materials could, therefore, result in the following advantages: (1) assure a more continuous supply of reasonably priced raw material, (2) give a freight advantage if deposits are found closer to the fertilizer plant, and (3) permit a substantial profit on the production of raw materials."

In this same document under the caption "Expenditure and Time Schedule" it was stated in connection with a solution mining project that:

> "In view of competitor activity and the possible early shift of the center of North American potash production from New Mexico to Saskatchewan, immediate commencement of the project is suggested. A proposed expenditure and time schedule is shown on the accompanying chart * * *. Phases I and II would be started in 1961 and run concurrently. The $200,000 expenditure for these two portions of

the program is a minimum. If the two well exploration effort did not locate sufficiently rich deposits, additional drilling would be required to locate satisfactory potash beds for the pilot test. Though extremely unlikely, this could necessitate the drilling of additional wells, possibly as many as six. Average cost of extra drilling would run about $60,000 per well.

"It is anticipated that the pilot test could start in the Spring of 1962. If potash was produced, successfully for as long as four months in the pilot test, it would be considered safe to initiate a commercial venture even though it would still be desirable to continue the pilot test for an additional eight months to gain further experience."

That this early interest by Imperial personnel in a potash project was shared by a Jersey department is evidenced by an interoffice memorandum of M. Mathis, a geologist in the Producing Coordination Department of Jersey, to W. E. Wallis, Exploration Manager of that department, wherein it was suggested that it would be advisable for Jersey to have a source of potash and phosphate. In this memorandum it was related, among other things, that:

"The demand for raw materials will increase materially in the future. Jersey is entering the fertilizer business from the standpoint of ammonia production and will need to buy the potash and phosphate requirements for its fertilizer production on the open market. It would be advantageous to have a source of these raw materials.

"Jersey should consider acquiring raw materials, either by the purchase of producing properties or by discoveries. Within the economic limitations imposed by transportation and location, Jersey geologists should include the search for potash and phosphate along with their search for oil."

A document captioned "Ammonia and Fertilizer Opportunities)" dated November 2, 1961 and found in the files of Fertilizer Opportunities," dated November of Jersey, relates:

"Phosphate and potash raw materials for the planned complex facilities will be purchased from established outside sources until such time that Jersey has located and put into production its own deposits of these materials. Plans are under way to have the personnel involved in Jersey's world-wide oil and gas exploration check for the presence of phosphate and potash materials specifically in Spain, England, France, Greece, Libya, India, Pakistan, Argentina, Guatemala and the United States."

While at the outset special emphasis was not placed upon any particular location for the development of a potash project, a later and more definite interest shifted to Canada as a consequence of the activities and studies made by Imperial. Early in 1961 Imperial acquired two Crown potash permits covering approximately 200,000 acres in the Moosejaw-Regina area of Saskatchewan. By 1962 it had been concluded that extremely rich beds of sylvinite (a mixture of sodium and potassium chloride) ore existed on the permit property but at a depth of 4,500 feet which is considered unsuitable for shaft mining. Preliminary studies by Imperial showed that solution mining might be highly profitable and that a pilot plant would cost less than $1 million. The pilot plant consisting of two wells and surface facilities was constructed. In connection with this project, Imperial requested and received technical assistance from Robert MacDonald, a chemist employed by Esso. Various reports of Imperial on its pilot project were sent to Esso.

When Imperial began its solution mining experiments it did so on the assumption that the economics of solution mining were fully competitive with, if not more favorable than, conventional shaft mining and on the further assumption that the time required to enter production would be only about two years as compared to five years for a shaft mine operation. The pilot project was completed in 1963 and was designed to test selective solution mining.

On May 22 and 23, 1963, J. W. Packie of Jersey Refining Coordination Department attended an Imperial meeting in Regina to discuss the project. It was announced by Imperial that despite its optimism as to selective mining, if insurmountable problems did arise, it was ready to resort to non-selective solution mining. Mr. Packie reported that:

"The progress to date has been sufficiently encouraging that solution mining, in one form or another, will be successful to warrant continuation of the development program in accordance with Imperial's plans."

The Imperial solution mining program contemplated a final decision by April 1964. During that month Imperial decided to abandon the project. It had cost approximately $2 million and was abandoned on the basis of conclusions that solution mining is not as economical and is technically more risky than shaft mining.

During 1963 while the solution mining project appeared to be progressing satisfactorily, Imperial demonstrated a parallel interest in shaft mining and acquired permit rights on property near Saskatoon, an area considered suitable for conventional shaft mining. Preliminary studies were made on methods of shaft mining and cost estimates, and the results of the studies were promising.

As a consequence of its studies, Imperial drilled core holes in permit area No. 4 and permit area No. 5 in the Saskatoon region. The holes in permit area No. 4 disclosed the existence of potash at depths greater than 3,700 feet, considered too deep for conventional shaft mining. The exploratory hole drilled in permit area No. 5 disclosed a bed of potash at a depth of 3,335 feet. It was felt that potash at such a depth could be mined by conventional shaft methods. Two other exploratory holes, not drilled by Imperial, also disclosed the existence of potash in permit area No. 5. Economic Research Corporation, Ltd., made a market study for Imperial of the North American and other Free World export markets for potash which was completed in 1962 and disclosed a substantial market in North America as well as overseas. Further market studies were made in July and November 1963 and in February 1964.

A meeting of Imperial personnel and representatives of Esso Chemicals was held on April 30, 1964 to discuss Imperial plans for mining potash in Saskatchewan. A report of this meeting was made by J. B. Matei, Engineering Business Analyst of Jersey's Producing Coordination Department, to Dr. R. J. Yoder, Division Head of Jersey Coordination and Planning Department for the Western Hemisphere. It set forth, among other things, that:

"Imperial concluded that they should end their solution mining efforts and formulate plans for entering into a shaft mining venture."

Mr. G. T. Piercy, a director of Imperial, requested Imperial personnel to prepare a memorandum on Saskatchewan potash possibilities. The memorandum, dated May 25, 1964, stated that the Saskatoon area, in which Imperial's permit No. 5 lies, is the most attractive for potash mining. Specifically, the report concluded that, on the basis of very limited information, the potential of the permit No. 5 area was good. It was suggested that if Jersey should decide to undertake a "grass roots" entry into the potash industry, Imperial should then proceed to delineate an ore body in permit No. 5 rather than acquire other property. An exploration program on permit No. 5 was expected to involve the drilling of a number of exploratory core holes at an expenditure of approximately $1.3 million. The report also set forth a plan of action for developing a market to support an Imperial shaft mine. Copies of this report were given to Mr. H. G. Mangelsdorf, President of Esso, and other Jersey personnel.

Mr. R. A. MacDonald visited the Producing Department of Imperial in Regina during July 1964 to review the proposed potash mining project. He reported on July 20, 1964 to Mr. T. E. Allen, the manager of the agricultural

chemicals department of Esso. In his report he related:

"Number 5 Permit has one core hole with potash showing in two zones. The richer indicating 7.5 feet of 27% $K_2O$ ore with insoluble matter of 3%+. The ore is sylvinite with only trace amounts of carnallite. Mr. Klingspor estimates that other drill holes could show greater thicknesses and potash concentrations based upon information from adjacent properties. The depth is approximately 3,000 feet, one of the shallowest in the basin. IOL personnel believe this to be one of the best deposits in Saskatchewan, and that it should be exploited with as much dispatch as possible.

"It appears that a proposal will be made shortly to proceed with the project in accordance with a stepwise program. Since the potash must eventually be marketed, primarily by Esso Chemical, we should be fully aware of the implications."

During the summer of 1964 Mr. Piercy met on several occasions with personnel of Esso to discuss aspects of the proposed Imperial mining project in Canada. He requested that Esso undertake a survey of Jersey poential for marketing potash. During the early part of 1964 he discussed Imperial's proposal to add $1.5 million to the 1965 budget to cover the cost of further exploratory drilling on permit No. 5. Mr. Mangelsdorf demonstrated interest in Imperial's proposed mining project and Siro Vazquez, head of the Producing Coordination Department of Jersey, recommended to Mr. Mangelsdorf that there be a comparison of an Imperial mining project with a joint venture such as had been considered with U. S. Borax, Homestake and Swift before further test drilling was done. On August 14, 1964, the day the BAC approved the acquisition of PCA, Mr. Mangelsdorf received a letter from Mr. Piercy fully outlining Imperial's proposal for its own shaft mining venture. Mr. Piercy was optimistic about the profit return based on a conservative estimated market growth of only 1.4% per year

(the parties have stipulated to a greater expansion and demand).

The expenditures of Imperial on potash projects up to the point of Jersey's acquisition of PCA were in excess of $2 million. If the acquisition agreement had not been reached, Imperial would have added an additional $1.5 million to its budget for additional test drillings in permit area No. 5.

The foregoing selective references to documentary evidence are representative of the main purport of all documentary evidence found in the files of Jersey departments and affiliates relating to the potash industry. In considering the probative value of this material, the Court has recognized the fact that it is arguable that statements contained in the documentary evidence might well be considered as individual expressions of opinion rather than a reflection of Jersey policy approved by top echelon management. But considering the totality of the accumulated documentary evidence, the responsible positions held by those who prepared it, the consistency of expression that it would be desirable for Jersey to enter the potash industry, the expenditures of money made for exploration and study, and the close supervision by Jersey of the activities of its departments and affiliates, the conclusion becomes inescapable that Jersey was aware of and sanctioned the objectives which department and affiliate personnel in the chemical field pursued. Jersey had a continuing interest since at least 1961 in obtaining its own captive source of potash. Allied to this motive for entering the potash industry was the knowledge that the potash industry was a highly profitable one.

It has been argued, however, by Jersey that the evidence will not support a conclusion that it would probably enter into the potash industry on a "grass roots" basis because the return in profit would not be comparable to that derived from other investments and would thus tend to reduce the overall current profits and, further, that it has not been shown that it would be economically feasible for it

to mine potash in any of its permit areas in Saskatchewan.

## PROFIT ASPECT

According to the testimony of Charles L. Scarlott, Treasurer of Esso Chemical Company, Jersey evaluates investment opportunities on the basis of calculated DCF (discounted cash flow) return. He described and illustrated this method of calculated return as follows:

"The DCF return simply establishes the rate at which all of the outflows equal all of the inflows. It is a technical matter. But it deals with the entire period of time over which the calculation was computed. The payout period is a simpler thing. It is simply the arithmetic addition of outflows and inflows, and over ordinarily a much shorter period of time.

THE COURT: Mr. Scarlott, I just want to be clear on this. Let us assume that you have one project where your payout period would be six years. You had another project where your payout would be two years. Assuming all other factors to be equal, wouldn't that difference of four years be reflected in your DCF, one being lower than the other?

THE WITNESS: No, sir; it would not. You can have a DCF return of a given figure for two propositions which have sufficiently different timing of outflows that you could get radically different payout periods. For example, it might be useful to look at the PCA analysis itself. In that case the payout period was approximately seven years—6.8 years—a function, in large part, of the fact, as has been brought out previously, we have a going concern, inflows occur promptly. In fact, the return which we calculated on the PCA acquisition was 16 per cent. That is not an order of magnitude as different from the 12.7 per cent that we have calculated for the Imperial project as is the difference between a seven-year payout in that case and a fourteen-year payout in the Imperial case. There is no direct or systematic relationship between the two. But, to answer your question, it is entirely possible and frequently occurs that you have comparable projects affording identical prospective DCF returns and quite different payout periods, that is, quite different risks associated."

\*   \*   \*   \*   \*   \*

"The DCF return involves, beginning at a point of time developing the cash flows from that point forward. It is extremely difficult and so far as I know never done to try to tackle a going concern and cutting in at a given point of time attempting to develop a DCF rate of return."

Mr. Piercy of Imperial using the DCF method of calculating profit on an independent potash project indicated a DCF return of 16.1%. This was based on the assumption that the total capital investment would not exceed $52.6 million for a mine and plant with annual productive capacity substantially in excess of one million tons KCl. Mr. Scarlott used a capital investment figure of $60 million and arrived at a DCF return of only 11.7%. The only substantial challenge to the calculations of Mr. Piercy is with respect to the difference in the figure of capital investment which accounts for the different result. At this point it may be noted that the total capital cost of PCA's potash project was $43.5 million. It must be considered, however, that this project has a present capacity of 600,000 tons KCl per year and, as previously noted, this could be increased by modifications to the surface plant. Another factor to be considered is that PCA incurred unusual expense because of its pioneering effort. Considering all of the evidence as to estimated total capital cost, it would seem that any figure used might in substantial degree be an arbitrary figure. Mr. Piercy estimated the DCF return with an investment project in mind. Mr. Scarlott made his calculations after the proposed acquisition of PCA.

It is argued that Jersey in considering possible entry into a new field of business

generally sets a guide line percentage of return on investment which is somewhat in excess of its average return on the mainstream of its business, because in making new investments Jersey is unwilling to dilute its return on the capital it has invested in the pertoleum business. As an example, Jersey cites the fact that it went into the fertilizer business on a projected DCF return of 22%.

Using Mr. Piercy's calculations, the projected average return (not DCF) on investment of Jersey in a self-developed potash project would be 8.2% over a period of 20 years. According to Mr. Scarlott, Jersey's return on net investment in overall operations in 1964 was 10.7%. It appears from Mr. Scarlott's testimony that one of the primary factors in his calculations of DCF was the extent of market growth over a period of 20 years. He conceded that by 1984 the rate of return would increase. His testimony explaining the basis of his calculations is quoted as follows:

"Q. And if you were to compare the two projects on the basis of the Canadian operations alone, the DCF then on the Imperial case would be higher than the DCF return you indicated last week? Wouldn't that raise the DCF?

A. That is correct. Perhaps it would be worth while for me to indicate why we did not use such a higher rate. It was simply because this is a field *which is not production limited but market limited, as Imperial indicated in their own notes, using a return rate of growth just slightly greater than three and three-quarters per cent,* the problem in the potash business is acquiring markets, penetrating markets. It is not difficult to mine and many are able. But the existing potash markets and the grade of growth in them is such in analyzing PCA and Imperial, in considering their possibility to use a rate of growth approximately 4 per cent in both cases.

Q. In other words, you didn't feel that you were distorting the possible DCF return by calculating Imperial's prospects on the basis of PCA operation, including Carlsbad, where production was, in fact, on the decrease instead of on the increase?

A. No, sir, we didn't since they would both be feeding into the same port and facing forces and the same hurdles in order to sell. Perhaps I could also say that if Imperial's assumption as to rate of growth were applied the result would be to increase the DCF. We calculate it by one-half of one per cent.

Q. This 8.2 per cent is an average for the period 1970 through 1984, is that not right?

A. The period 1965 through 1984, twenty years.

Q. And the trend over the years is, of course, an increase until the year 1984, is that not right, an increase in the rate of return?

A. Strictly speaking it is U-shaped, there are relatively high returns in the immediate years, declining and then increasing over the remaining years.

Q. *And that by 1984 the rate of return on this particular basis would be about 16 per cent rather than 8 per cent?*

A. That is right, sir." (Emphasis supplied)

There is no doubt from the evidence that acquisition of PCA from the profit aspect was much more attractive than a self-developed potash project. The Court is also satisfied that in the absence of the acquisition of PCA, Imperial would still pursue the opportunity for a self-developed project in Saskatchewan. Negotiations leading up to the acquisition agreement commenced in the summer of 1964. The interest of Imperial in a self-developed project in Saskatchewan was not halted until agreement between Jersey and PCA had been reached.

Implicit in the change of interest from a self-developed potash project to acquisition is the more attractive investment opportunity presented by the acquisition. On June 25, 1965 when it appeared that PCA was willing to sell to Jersey, Mangelsdorf was urged by R. A. MacDonald

and T. E. Allen to act quickly for the following reasons:

"Quick action on the acquisition is essential for several reasons, the most urgent being the continuous improvement in the market price from $26/share bid in August 1963, when the proposal was first made, to the present $40/share bid, an increase of over 50%. The second reason is the attractive profits publicly associated with potash as exemplified by International Minerals' Canadian property. Thirdly, the Denver company is unique in being almost exclusively a potash miner; therefore, its acquisition would be desirable to a number of fertilizer companies who are not potash miners. Fourth, is the inevitable fact that good properties will become more scarce as this new mining field is opened: Historically, the companies with a good land position in any new oil or mining play have been the ones to whom the profits accrue."

The presentation of the acquisition project to BAC by Esso Chemicals related, among other things:

" * * * Jersey desires to enter into production of phosphate and potash raw materials to supplement nitrogen production. Careful study of all free-world potash sources shows that the Denver Company is the only producer having large sylvinite ore reserves in both the United States and Canada that are presently in production or near production. This position with respect to ore reserves and production capabilities gives Denver a time advantage of at least 5 years in very profitable and expandable Canadian production—by convention mining—over any other company except International Minerals & Chemicals Company. * * * *Denver is in an excellent position to share fully and immediately in the conservatively estimated growth rate of 6% per year in the markets of North and South America, Oceania, and in the Far East,* and to supply as well Jersey's estimated requirements by 1966 of around 130,-000 tons per year of $K_2O$, which should grow to about 270,000 tons per year by 1971. Denver's sound position in supply and marketing will enable it to remain competitive with any changes in marketing pattern." (Emphasis supplied)

The situation upon which Jersey acted was one of relative profit advantage. The documentary evidence relating to the acquisition emphasized the same basic motivating factors that stimulated interest in a self-developed project. Jersey desired a captive source of potash for its fertilizer business and, in conjunction with this, the potash industry itself presented an attractive opportunity for investment.

One further argument of Jersey which might be dealt with here is that it has no expertise in mining or marketing of potash and that by reason thereof it would suffer a cost production and competitive marketing disadvantage. The answer to this is that Jersey has not hesitated to enter new fields of enterprise because of a previous lack of experience. One example is the mixed fertilizer business. Moreover, it has been recruiting expertise in the potash industry and has available consultant advice to develop expertise on marketing. Besides, the prices of potash have been uniform. Demand has kept apace with supply, and 95% of sales are to fertilizer companies.

## IMPERIAL PERMIT NO. 5

Jersey contends that the evidence does not support a conclusion that it would be able to develop a feasible potash mining operation on Imperial permit No. 5. The evidence on this is conflicting. Imperial personnel who considered known information about the possibilities of permit No. 5 and adjacent property concluded prior to the PCA acquisition agreement that permit No. 5 had the potential of being a good competitive possibility. A. M. Klingspor, an Imperial geologist, evaluated permit No. 5 as being "eminently suitable for mining." His report to Imperial as to this in a memorandum captioned "Potash Memorandum for G.

T. Piercy" dated May 25, 1964 reads as follows:

"With regard to Imperial holdings, permit #5, about 30 miles east of Saskatoon is eminently suitable for mining. The ore is at depths between 3100' and 3400' and shows concentration in three mineable slices each from 6 to 12' thick. The best of these, including a suitable base break, may run about 30% $K_2O$ average over 8' thickness with 5 to 7' insolubles. Good continuity of the ore is indicated by a number of abandoned oil exploration wells on and around permit #5. A good and sufficiently thick salt back is present and the formations immediately overlying the salt are very competent and contain no water. From these aspects permit #5 is considered the most attractive among the known properties."

Mr. Klingspor thought the property on permit No. 5 superior for mining purposes to adjacent properties upon which Noranda plans to sink a shaft and build a mining operation. The favorable potential of permit No. 5 was shared by other Imperial personnel.

It might also be noted as to Mr. Klingspor's qualifications as a geologist that he was used by Jersey to evaluate potential potash properties in Spain and Ethiopia.

Dr. Banfield, a consulting geologist who had also been used previously by Jersey to examine and evaluate data as to potash reserves, was retained during December 1964 to study and analyze the potash permit property held by Imperial in Saskatchewan. He testified that he considered the prospect of delineating a good ore body on permit No. 5 as unfavorable in the areas where the potash lies at a depth suitable for conventional mining. He conceded, however, on his direct examination that he did not have enough information to reach a definite conclusion. He stated:

"Q. Referring to Permit No. 5, * * * do you have sufficient information as to what lies in that permit to make any determination as to whether or not such potash as there is is deep enough or high enough to be reached by shaft mining?

A. Yes.

Q. What is your conclusion as to that?

A. Well, more information is necessary to determine whether a shaft should be sunk."

The evidence adduced from the testimony of Dr. Banfield does not rule out the existence of a good ore body on permit No. 5 which can be developed by shaft mining. Treated in the light most favorable to Jersey, it does no more than support the conclusion that further exploratory work must be done in order to determine where, within the area, there is a good location for a shaft mine. This exploratory work had been recommended by Imperial at an expenditure of $1,292,000. Also, as previously indicated, ultimate resort to solution mining cannot be ruled out.

## CONCLUSIONS

■ It is uncontroverted that Jersey's acquisition of PCA will foreclose other United States producers from competing for sales to Jersey. The nature and extent of foreclosure of the market determines the vertical anticompetitive effect. If the effect "may be substantially to lessen competition" the acquisition of PCA by Jersey violates Section 7 of the Clayton Act. The percentage of the market which is foreclosed is an element to be considered, but it is not the conclusive determinative factor.

■ Measured solely and strictly in terms of mathematical percentage, the immediate impact of acquisition of PCA upon competition in the United States potash market would not appear to be substantial, but such a narrow approach is not consistent with the objectives of Section 7 of the Act. Concentration in the industry, as well as the degree of existing competition, must also be considered. See United States v. Aluminum

Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964). Concentration is great and the margin of existing competition is narrow. Slight change in the structure of this market would probably produce substantial anticompetitive effect.

Neither may the Court look only to the immediate impact. The history of the potash industry and probable future developments on a long term basis must also be scrutinized. It was stated in Brown Shoe Co. v. United States, 370 U.S. 294, 321–323, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 (1962):

"* * * while providing no definite quantitative or qualitative tests by which enforcement agencies could gauge the effects of a given merger to determine whether it may 'substantially' lessen competition or tend toward monopoly, Congress indicated plainly that a merger had to be functionally viewed, in the context of its particular industry. That is, whether the consolidation was to take place in an industry that was fragmented rather than concentrated, that had seen a recent trend toward domination by a few leaders or had remained fairly consistent in its distribution of market shares among the participating companies, that had experienced easy access to markets by suppliers and easy access to suppliers by buyers or had witnessed foreclosure of business, that had witnessed the ready entry of new competition or the erection of barriers to prospective entrants, all were aspects, varying in importance with the merger under consideration, which would properly be taken into account."

\* \* \* \* \* \*

"* * * Congress used the words 'may be substantially to lessen competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable

anticompetitive effect were to be proscribed by this Act."

Commenting upon the appraisal of anticompetitive effect which must be made in a particular industry, the Supreme Court in the case of United States v. Philadelphia National Bank, 374 U.S. 321 at page 362, 83 S.Ct. 1715 at page 1741, 10 L.Ed.2d 915 (1963) stated:

"Clearly, this is not the kind of question which is susceptible of a ready and precise answer in most cases. It requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their 'incipiency.' See Brown Shoe Co., supra [370 U.S.], at 317, 322 [82 S.Ct., at 1519, 1520]. Such a prediction is sound only if it is based upon a firm understanding of the structure of the relevant market; yet the relevant economic data are both complex and elusive."

New entrants into the industry do not find access easy. Substantial capital financing over a period of years is required before production can start. They must also reckon with efficiency in cost production of the well established potash producers. Moreover, resources of potash which can be mined economically for the United States market are not readily found or easily developed when located. At this juncture it should be noted that the high grade ore reserves of Carlsbad which have provided most of the production for the United States market for many years are being depleted rapidly and the remaining life of most of the mines is less than 20 years. PCA anticipates that its reserves in Carlsbad will be exhausted in 15 years.

Measured against consumption in the Free World including the United States, Jersey's 1965 estimated requirements of 87,000 tons $K_2O$ amounts to less than

1%.[15] By 1971 Jersey's projected consumption of 270,000 short tons $K_2O$ will amount to approximately 2% of the Free World consumption estimated to be 13,400,000 to 15,550,000 tons $K_2O$.[16]

Though Jersey's projected 1971 demand of 270,000 tons $K_2O$ is estimated to equal approximately 2% of projected world consumption, it would at least equal all and perhaps surpass the present productive capacity of two of the smallest United States producers. It would absorb approximately 29% of PCA's total projected productive capacity. When PCA's Carlsbad reserves are exhausted, Jersey would absorb the major part of PCA's present Canadian production for its fertilizer business.

There is another factor that requires consideration. According to the evidence, the United States market is presently the most attractive market for Canadian production of potash considered on the basis of price and logistics. The factor of logistics on Canadian production would remain constant, but price could vary according to the urgency of demand in the world markets. It seems that despite the favorable factor of logistics and price in the United States market and tight supply of potash, the large producers have been willing to export a percentage of their production apparently for the purpose of being in a future position to take advantage of favorable development of markets outside the United States. Mr. Gidney, Vice President of PCA in charge of sales, testified:

"Q. What countries has PCA sold potash in recent years in Western Europe?

A. In recent years we have sold potash in the United Kingdom, in Norway and in Italy.

Q. Do you currently receive inquiries from European interests who wish to purchase potash from United States sources?

A. Yes, sir, we do regularly.

Q. From what countries have you received such questions? If you recall any.

A. Within the past few years we have had inquiries from Ireland, United Kingdom, Belgium, the Netherlands, Norway, Sweden, Italy, Greece, Yugoslavia and Austria."

Another factor of importance in analyzing the probable future United States market is the recent trend toward backward integration in the fertilizer business whereby substantial amounts of potash production as captive sources of supply may be withdrawn from the competitive market.

15. In GX 110, para. 13, the parties have stipulated estimated Free World consumption outside the United States for 1965 to equal 6,610,000 tons $K_2O$ (1,710,000 plus 180,000 plus 4,720,000). The parties have not stipulated United States consumption for the year 1965. They have, however, stipulated United States agricultural consumption for 1964 (GX 110, para. 6). They have also stipulated that agricultural consumption is 95% of total consumption (Ibid.). They have also stipulated the estimated growth rate in United States consumption to be 5 to 10% annually. (GX 110, para. 13). From these figures the range of total United States consumption in 1965 can be derived as follows:

$$2,839,965 \times \frac{100}{95} = 2,989,437 \text{ (total 1964 consumption)}$$
$$2,989,437 \text{ plus } 5\% \text{ growth} = 3,138,899$$
$$2,989,437 \text{ plus } 10\% \text{ growth} = 3,288,381$$

16. The 1971 consumption figures are derived by applying the estimated growth rates to which the parties have stipulated for each of the areas of the Free World (GX 110, para. 13) to the 1965 consumption figures set forth in Footnote 15 for each of those areas. The manner of computation in each case is identical to that used in computing compound interest, since the percentage growth each year is from the total of the immediately preceding year.

■ A short term evaluation of anti-competitive effect on the United States market in the potash industry is not consistent with the objectives of Section 7 of the Clayton Act. Section 7 protects "not only existing competition but that which is sufficiently probable and imminent." United States v. Continental Can, 378 U.S. 441, 458, 84 S.Ct. 1738, 1748, 12 L.Ed.2d 953 (1964). What is "imminent" in a practical sense depends upon the particular industry. In some industries radical changes can occur in the growth of competition within a very short period of time. Such would be the case where relatively small capital investment is required and easy access to resources for profitable production is possible. In the potash industry new production comes on-stream slowly and the extent to which there will be further productive capacity beyond that projected to 1971 is highly conjectural. The restraining barriers are: (1) substantial long term capital financing; (2) control of resources of potash that can be economically mined; (3) the formidable investment hazard to a potentially small producer of competing with the firmly entrenched and economically powerful occupants of the field. It is also observed from the evidence that productive capacity as that term has been used in this case (both present and projected) cannot be equated with actual production. Actual production is always less because of breakdowns and other unforeseeable interruptions.

■ The fact that Jersey is not presently engaged in the business of producing and selling potash and hence not a competitor in the market is of no significance. See United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). Neither is the fact that competitors in the potash industry are not concerned with Jersey's acquisition of PCA. The Act protects competition, not competitors. The Court stated in United States v. Philadelphia National Bank, supra, footnote 43 at page 367 of 374 U.S., at page 1743 of 83 S.Ct.:

"The fact that some of the bank officers who testified represented small banks in competition with appellees does not substantially enhance the probative value of their testimony. The test of a competitive market is not only whether small competitors flourish but also whether consumers are well served. See United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 588, 592 (D.C.S.D.N.Y.1958). '[C]ongressional concern [was] with the protection of *competition,* not *competitors.*' Brown Shoe Co., supra [370 U.S.] at 320 [82 S.Ct. at 1521]. In an oligopolistic market, small companies may be perfectly content to follow the high prices set by the dominant firms, yet the market may be profoundly anti-competitive."

■ The Court finds as to foreclosure of a portion of the market from competition by Jersey's acquisition of PCA that the probable effect will be to substantially lessen present as well as future competition in the United States potash market. The Court further finds that if Jersey cannot acquire PCA, it is probable that it will not abandon its exploration for potash reserves and achievement of the ultimate goal of a self-developed project. Jersey will probably remain a potential competitor in the potash industry in the United States market, likely to enter on a "grass roots" basis just as soon as continued exploration for a good potash ore body develops the opportunity. See United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964). Jersey has financial resources for long term capital financing; it has the incentive to acquire its own captive source of supply of potash for its fertilizer business; the potash industry is profitable and likely to remain so; Jersey has control of resources of potash and the potential to develop them or acquire others; and its economic power is such that it could ultimately compete with any presently established rival producer.

The vertical and horizontal aspects of the proposed acquisition of PCA have

228

been considered separately. As to each the Court finds that the probable effect may be to substantially lessen competition in the United States potash market. Conjoined evaluation of the vertical and horizontal effects emphasize that probability.

The acquisition of PCA by Jersey will be permanently enjoined and an appropriate order for entry of judgment in conformity herewith will be submitted.